[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
The plaintiff, Greenwich Global, LLC., is a securities dealer licensed to do business in Connecticut. In its complaint dated March 7, 2001, it seeks to void a set of resolutions (Resolutions) adopted by the defendant, Clairvoyant Capital, LLC., (Clairvoyant), and requests other legal and equitable relief.
In a pleading dated April 30, 2001, the defendant answered the complaint with affirmative defenses and counterclaim in several counts for the enforcement of the Resolutions, breach of contract, indemnification, conversion, breach of fiduciary duty, and an accounting.
The case was tried before this court over several days. Proposed findings of fact and conclusions of law were submitted by both sides.
The court finds against the plaintiff on its claim to void the Resolutions and in favor of the defendant and its counterclaim as more specifically stated below. CT Page 10772
Background and Factual Findings
John J. Flynn VIII (Flynn) formed defendant Clairvoyant Capital LLC, (Clairvoyant) in 1997 for the purpose of acquiring Greenwich Global LP, (GGLP) a registered broker/dealer and a limited partnership organized under Delaware law, and arranged the acquisition with the assistance of O. Beirne Chisolm (Chisolm), the chief financial officer of GGLP. Flynn raised money from investors, all of whom were relatives or friends of Flynn, to fund the purchase of GGLP by Clairvoyant. Clairvoyant designated those investors as "Preferred Investors." Flynn owned 51% of Clairvoyant. Chisolm owned 49% of Clairvoyant. Flynn and Chisolm were the only executive officers of Clairvoyant, which is a limited liability company under Delaware law. The contract between the parties is governed by Delaware law. (Pl. Exh. 1, § 9.05).
Flynn, Chisolm and Clairvoyant entered into a partnership Agreement concerning GGLP. (Pl. Exh. 1) Under the Partnership Agreement, Clairvoyant was the general partner of the partnership and owned 2%. While the percentage of GGLP owned by Flynn and Chisolm varied as other limited partners joined or departed from GGLP, Flynn and Chisolm always owned at least 68% and there were never more than two other limited partners. Although Clairvoyant contributed the purchase price for GGLP of $125,000.00, the purchase of GGLP was structured as a purchase of assets by Clairvoyant and Chisolm from the former owner of GGLP. Therefore, Clairvoyant's investment in GGLP was not recorded on GGLP's books as an addition to Clairvoyant's capital account. All of the parties involved in the purchase and sale of GGLP were represented by the same lawyer, Sam Abernathy, a long-time friend of Chisolm.
During the trial, the Partnership Agreement was described by Gary Gittler of Weiss Allen, outside auditor for GGLP, as the "springboard" from which any review of the financials of GGLP must begin. The Partnership Agreement attached three versions of a "Schedule of Partners," each of which reflected a capital contribution by Clairvoyant of $125,000.00. The three versions of the Schedule of Partners showed Flynn's interest in GGLP varying from 49% to 36.5% to 44%. The Partnership Agreement expressly incorporated the Schedule of Partners. (Pl. Exh. 1, § 1.05).
Chisolm served as Chairman of GGLP and Chief Financial Officer of both Clairvoyant and GGLP. He kept the books of both companies on his computer in the form of QuickBooks data files. Chisolm communicated with Weiss 
Allen, accountants for both companies, and was the sole source of information provided to Weiss Allen by either GGLP or Clairvoyant. The manner in which Chisolm maintained the books and records of Clairvoyant and GGLP causes the Court to doubt the accuracy of those books and CT Page 10773 records. For example, a wire transfer of $50,000.00 from Clairvoyant to GGLP that appears on the books of Clairvoyant does not appear on the books of GGLP. (Def. Exh. N and Z). Numerous auditor adjustments appear on the books of Clairvoyant and the books of GGLP. These adjustments appear without explanation. In conjunction with other conduct of Chisolm, noted below, the Court concludes that his testimony was untrustworthy.
Clairvoyant agreed to return to each of the Preferred Investors his or her investment should the Preferred Investor decide to withdraw from Clairvoyant, including interest at 8%. GGLP and Clairvoyant agreed that in the event a Preferred Investor decided to withdraw from Clairvoyant, GGLP would pay to Clairvoyant the amount of that Preferred Investor's investment, plus interest at 8% (if earned). The agreement between Clairvoyant and GGLP was confirmed by a letter from Chisolm, as Chairman of GGLP, to the Preferred Investors of Clairvoyant. (Def. Exh. EE). As of September 30, 2000, the Preferred Investors' investments, subject to the agreement between Clairvoyant and GGLP, appear to be worth $106,000.00 in the aggregate.
In 1998, Plymouth Partners, a Preferred Investor, withdrew from Clairvoyant. GGLP returned to Plymouth Partners its investment in Clairvoyant plus interest (Def. Exh. N). In August 2000, Chisolm, withdrew from Clairvoyant and Clairvoyant paid to him his entire preferred investment amount plus 8% interest. In 1998, Aditya Singh, a limited partner in GGLP, withdrew from GGLP. GGLP returned to Singh his capital account, plus his share of net income for the year in which he withdrew.
A few days after December 24, 1998, Flynn learned that he had been named in a NASD regulatory complaint. Prior to that date, Flynn was not involved in any disciplinary action by any regulator agency. On the advice of Chisolm, Flynn retained Attorney Abernathy to represent him. Abernathy was then acting as general counsel to GGLP.
By March of 2000, Chisolm expressed a desire to retire from day-to-day participation in GGLP and to move to North Carolina. In June, 2000, Chisolm hired John Parent and Sheldon Lawrence to work at GGLP. By September 2000, differences had arisen between Chisolm and Flynn concerning the management of GGLP after Chisolm's "retirement". (Def. Exh. FF). Parent insisted that Flynn leave GGLP before Parent formally took on a position with the company.
On or before September 25, 2000, in order to induce Flynn to resign from his position as president, trader, and limited partner of GGLP, Chisolm, on behalf of GGLP, and Flynn, on behalf of Clairvoyant, agreed that if Flynn would resign from GGLP, GGLP would: 1) return to Flynn his CT Page 10774 partnership interest as of September 30, 2000, including his share of GGLP's net income to that date; 2) buy out Clairvoyant's interest in GGLP; 3) buy out the Preferred Investors in Clairvoyant; 4) refrain from engaging in activities that would expose Clairvoyant, as general partner, to liability until Clairvoyant's withdrawal had been effected, since Clairvoyant would no longer be involved in the day to day operations of GGLP, and 5) provide Flynn, within five days, with a written letter of understanding reflecting the terms to which Chisolm had agreed. Flynn confirmed the terms promised by Chisolm in a letter hand delivered to Parent and Chisolm on September 25, 2000. (Pl. Exh. 10).
Flynn ceased his employment as trader, salesman and supervisor at GGLP on September 26, 2000.(Def. Exh. U). Chisolm, who had withdrawn his capital contribution from Clairvoyant in August 2000, ceased exercising any authority or office on behalf of Clairvoyant as of that date. Chisolm did not, however, turn over Clairvoyant's books and records to Flynn. Clairvoyant's books and records were kept and secured by Parent and Chisolm, computer passwords were changed, and Flynn was removed as a signatory on the GGLP bank account. (Def. Exh. GG). Parent restricted Flynn's access to the offices of GGLP and eventually locked Flynn out of those offices. (Def. Exh.DD).
On October 1, 2000, Flynn sent a letter to the Preferred Investors and to Sam Abernathy, then acting as a general outside counsel to GGLP, again stating that GGLP must buy out the Preferred Investors. (Def. Exh. DD).
The GGLP Partnership Agreement provides that a withdrawing partner "shall receive, within 10 days of such withdrawal . . . an amount in cash equal to 90% of the Withdrawal Amount, . . . as determined by the General Partner." (Pl. Exh. 1, § 6.04). The Partnership Agreement does not grant to GGLP the right to withhold or discount any part of the Withdrawal Amount in contemplation of future setoffs against the withdrawing partner. GGLP never paid to either Flynn or Clairvoyant 90% of their respective Withdrawal Amounts.
The Partnership Agreement contained both an exculpation clause and an indemnification clause providing that the GGLP would hold harmless any partner for any loss suffered, including attorney's fees, in connection with "any action or proceeding" against the partner, as long as the loss resulted from action or inaction that the partner "reasonably believed to be in, or not opposed to, the best interests of the partnership." (Pl. Exh. 1, §§ 2.05, 2.06).
Flynn made frequent requests to Chisolm, Parent and to Weiss Allen for information concerning the value of the interests of Clairvoyant and of Flynn in GGLP and the value of the investments made by the Preferred CT Page 10775 Investors. Chisolm and Parent refused to provide Flynn with the requested information. At the direction of Chisolm, Weiss Allen refused to provide Flynn with the requested information. The Court finds this conduct troubling, especially since Clairvoyant was a client of Weiss Allen and Flynn was the only executive officer of Clairvoyant at the time. (Def. Exh. S). Without financial information, Clairvoyant, as general partner of GGLP, could not determine the Withdrawal Amounts for it or for Flynn.
On November 28, 2000, GGLP made an offer of settlement to Clairvoyant and Flynn for their partnership interests in GGLP as of September 30, 2000. Flynn rejected the offers because he believed they did not adequately value the partnership interests in GGLP and because they did not include a buy out of the Preferred Investors.
In order to force Clairvoyant and Flynn to accept GGLP offers, Chisolm wrote to Flynn's parents, both of whom were Preferred Investors, and told them that should Flynn and Clairvoyant "choose to fight [the offers made on November 28, 2000], Flynn would be hurt financially and his career in the securities industry will be over". (Def. Exh. B). The Court finds that this particular communication to be a very telling example of Chisolm's behavior.
Chisolm and Parent told Flynn that he had until December 12, 2000, to accept the November 28 offers or GGLP would hurt him financially and ruin his career in the securities industry. On December 11, 2000, Flynn rejected the November 28 offers. On December 12, 2000: 1) Parent amended Flynn's U-5 to indicate that Flynn was the subject of an internal review; 2) Parent called U.S. Clearing to ask it to commence an investigation of Flynn; (It is noted by the court that the "internal review" was for all intents and purposes, non existent. Further, amending a securities dealer/trader's U-5 can have career altering consequences); and 3) Attorney Abernathy who had earlier advised Mr. Flynn, commenced an arbitration against Flynn. One month later, GGLP, through its attorneys, advised the NASD that Flynn had intentionally "circumvented" compliance procedures while at GGLP in order to violate regulations. Neither GGLP nor its attorneys had, in fact, undertaken an investigation and neither had any reasonable basis in fact for the allegations made against Flynn. In fact, Flynn had not violated any compliance procedures.
GGLP never honored the verbal agreement it made with Clairvoyant concerning the withdrawal of Flynn and Clairvoyant from GGLP and the payment of the Preferred lnvestors. Clairvoyant never withdrew as General Partner of GGLP. When Chisolm was asked on direct examination: "Did Clairvoyant ever withdraw as general partner?", he answered: "They did not." CT Page 10776
By February 2001, GGLP had not paid to either Flynn or Clairvoyant their respective Withdrawal Amounts. Each of the Preferred Investors had demanded the return of their investments and GGLP had refused to honor its agreement to pay the Preferred Investors. On February 26, 2001, Clairvoyant, acting as the general partner of GGLP, caused GGLP to pass resolutions (the "Resolutions") providing that GGLP would promptly distribute net profits and pro rata interests in warrants to Clairvoyant and to all of the limited partners, including Flynn; disburse to Flynn and Clairvoyant their partnership interests, provide books and records from which those interests could be calculated; and conduct no further principal business until Flynn and Clairvoyant were paid their partnership interests; a successor general partner to Clairvoyant was designated, and the SEC and NASD were apprised of a change of control at GGLP.
In response to the Resolutions, the remaining limited partners of GGLP (Chisolm and James Manning) purported to convert GGLP into Greenwich Global LLC, a limited liability company, the plaintiff. Flynn's partnership interest in GGLP was "reduced" to zero through a book entry that Weiss Allen was "directed" to make by Chisolm. No payments were made to Flynn or Clairvoyant in connection with the conversion. Plaintiff reported to government regulators that the conversion of GGLP to Greenwich Global LLC did not involve a change of control. (Def. Exh. JJ).
Clairvoyant's partnership interest in GGLP was worth at least $64,171.49 on September 30, 2000, and may have been worth much more than that amount, per the testimony of the defendant's expert, Bernard Spear.
Conclusions of Law
Neither the Partnership Agreement nor Delaware law provides for the removal of the general partners of GGLP by the limited partners without a court order. Del. Code Ann, tit. 6, 17-402. Clairvoyant was the General Partner of GGLP on February 26, 2001. The Partnership Agreement provides that "the power . . . to make decisions with regard to the management of the Partnership shall be vested exclusively in the General Partner . . . ." (Pl. Exh. 1, § 2.01). As General Partner of GGLP, Clairvoyant had the authority to issue the Resolutions. The Partnership Agreement permits the general partner, when exercising its authority, to consider its own interests and those of its affiliates to the extent that such interests do not conflict with the overall interests and purposes of the Partnership. (Pl. Exh. 1, § 2.08). The Resolutions were intended to enforce the provisions of the Partnership Agreement and of the verbal agreement between GGLP and Clairvoyant and were not in conflict with the interests of GGLP. A general partner acting in good faith reliance on the provisions of the partnership agreement is shielded from liability for CT Page 10777 breach of fiduciary duty. Del. Code. Ann. tit. 6, 17-1101 (d)). Therefore, Clairvoyant did not breach its fiduciary duty to the limited partners of GGLP and the Resolutions are valid and enforceable. Furthermore, Clairvoyant is entitled to an order enforcing the Resolutions. It is so ordered.
Greenwich Global LLC has succeeded to the liabilities of GGLP. Delaware Limited Liability Company Act Section (Del. Code. Ann. tit. 6, 18-214 (f)).
Because Clairvoyant did not breach its fiduciary duties by issuing the Resolutions, the attempt by certain limited partners of GGLP to remove Clairvoyant as general partner of GGLP based on the alleged breach of fiduciary duty by Clairvoyant was ineffective. The Partnership Agreement provides that the partnership shall continue to operate "until . . . any date during the Partnership's duration by decision of the General Partner." (Pl. Exh. 1, § 7.01 (iii)). Without the authorization of Clairvoyant, the attempted conversion of GGLP to Greenwich Global LLC was invalid under Delaware law. Del. Code Ann. tit. 6, 18-214 (b).
As of September 26, 2000, GGLP exercised exclusive control over a) the books and records of Clairvoyant and of GGLP, b) access to the accountants for Clairvoyant and for GGLP, c) the partnership interests of Clairvoyant and of the limited partners of GGLP, and d) the business activities that might give rise to liability for Clairvoyant as the dejure general partner of GGLP. Therefore, GGLP owed a fiduciary duty to Clairvoyant. The acts engaged in by GGLP after September 30, 2000 — including threats against Flynn, misrepresentations to regulatory authorities, preventing Clairvoyant from accessing books and records or communicating with the accounts, and deleting Flynn's capital account through an unexplained book entry — constituted a breach of GGLP's fiduciary duty to Clairvoyant. The conduct necessitates severe action.
Plaintiff's breach of fiduciary duty entitled Clairvoyant to damages, including the value of Clairvoyant's partnership interest in GGLP, interest for the loss of use of the partnership interests and profits that should have been distributed to Clairvoyant and to Flynn, a constructive trust over the profits GGLP received through improper use of Clairvoyant's and Flynn's partnership interests, and damages, including reasonable attorney's fees, since the conduct of Clairvoyant, a partner, after September 30, 2000, was necessary to further the best interests of the partnership. (See Pl 1. Exh. §§ 2.05, 2.06).
GGLP breached its obligations to Clairvoyant under the Partnership Agreement and under the agreement concerning Preferred Investors. GGLP is liable to Clairvoyant for compensatory damages in the amount of the partnership interest of Clairvoyant and the investments of the Preferred CT Page 10778 Investors as of September 30, 2000, plus interest on that sum from September 30, 2000.
Clairvoyant is entitled to indemnification for the costs and attorney's fees incurred by it in defense of this action, in an amount to be determined by the court upon application by counsel for Clairvoyant.
The parties will appear before the Court at a future date for further actions consistent with this opinion. The Court expects that the prevailing party will provide proof of counsel fees and costs. Absent an agreement of the parties, the Court will seek recommendations for an independent auditor for valuation of the interests of Clairvoyant as of September 30, 2000.
BY THE COURT
 ______________________ Downey, J.